Richard Glen Van Houten ("the father") appeals the trial court's denial of his petition to modify his child-support obligation arising from his divorce from Martha Lynn Van Houten ("the mother").
The father filed a petition on April 10, 2002, asking the trial court to modify his child-support payments. The mother answered on May 31, 2002. On October 30, 2002, the mother filed an amendment to her answer in which she petitioned for a rule nisi, alleging that the father had failed to pay child support.
The trial court conducted an ore tenus hearing on February 18, 2003. On March 3, 2003, the trial court entered a judgment denying the father's petition to modify and granting the mother's counterpetition for a rule nisi. The trial court held the father in contempt because he had accrued arrearages for unpaid medical expenses in the amount of $2,739.55, other miscellaneous expenses in the amount of $1,440, unpaid extracurricular-activity expenses in the amount of $6,422.76, and child support in the amount of $3,500. The total amount of the arrearages was $14,102.31. The trial court also held the father in contempt for allowing his life-insurance policy, maintained for the benefit of the children, to lapse. The father was ordered to immediately reinstate his life-insurance policy and *Page 984 
to pay the mother an attorney fee in the amount of $3,875.
The father filed a "motion to reconsider" on March 12, 2003. On March 27, 2003, the father filed an amended motion pursuant to Rule 59, Ala. R. Civ. P. The mother filed her response, and she filed a motion for an additional attorney fee. On May 28, 2003, the trial court entered an order denying both parties' motions. The father timely appealed.
The father and the mother were married in 1980. Three children were born during the marriage; the children were ages 18, 15, and 11 at the time of the hearing. The mother filed for divorce in 2000, and the parties agreed to submit to mediation. During the mediation, the parties reached a settlement agreement. The divorce judgment, which incorporated the parties' settlement agreement, provided that the father would pay the following support-related expenses: a) $1,500 per month in child support, b) one-half of the children's extracurricular-activity expenses, c) medical and dental insurance for all three children, d) one-half of all medical expenses not covered by insurance, e) the cost of a life-insurance policy on himself for the benefit of the children, f) one-half of all college-related expenses for each child, g) payment of the cost of tuition for the children to attend Briarwood Christian School as long as the tuition was provided by the father's employer, and h) one-half of all tutoring expenses for the children. The parties agree that the child-support portion of the trial court's divorce judgment was based on a CS-41 ("Child Support Obligation Income Statement Affidavit") form in which the father's annual income was recorded as being $92,633.
The father had worked from 1994 to 2000 as Outreach Pastor for Briarwood Presbyterian Church in Birmingham (hereinafter "the church"). In his position as Outreach Pastor, the father earned a salary and benefits which totaled $92,633. Included in the father's compensation package from the church was a salary of almost $60,000, a $22,000 per year housing allowance, a work vehicle, a life-insurance policy in the amount of $50,000, family medical and dental insurance, a retirement account contributed to solely by the church that had accumulated a value of approximately $60,000 by the time of the February 18, 2003, hearing, and free tuition for the parties' three children at Briarwood Christian School. When the parties divorced, the father was "demoted" from his position as Outreach Pastor and was placed on the staff with the Young Business Leaders ("YBL"); in his brief on appeal, the father explains that the YBL is affiliated with the church. The father's salary and benefits did not change with his new position; however, he testified that he "lost the ability to make more income."
The father testified that when he was demoted to the YBL, he decided to obtain a real-estate license and build a career in real estate. The father testified that he had planned to work in both careers until he earned enough money from selling real estate to cover his expenses.
The father testified that he met and fell in love with a woman in 2002. The father was planning to marry the woman when he was approached by an elder from the church who served as the father's immediate supervisor. The father testified that his supervisor asked him to delay the marriage until December 2002 so that the church council could meet and discuss the father's remarriage. The father admitted that at the time his supervisor approached him about delaying his marriage, he and his soon-to-be wife had not yet set a date for their wedding. The father admitted that it was "possible" that his second marriage would have been approved by the *Page 985 
church council if he had waited until December 2002 to marry. However, the father testified that he did not want to live "in sin" with the woman, and, therefore, he married her on August 1, 2002.
The father testified that he did not believe that he would lose his job if he remarried; he explained that there were two men working for the church who were divorced. The father married his second wife (hereinafter "the second wife") on August 1, 2002, but he kept his marriage a secret. When he informed the church of his second marriage at some time in September 2002, the father was asked to resign. The father testified that church officials told him that he needed to resign because he had kept his remarriage a secret. In a March 21, 2003, letter directed to "whom it may concern," the father's supervisor stated that "[the father] was asked to leave YBL after his second marriage. The timing and the circumstances of his marriage led us to reach this decision."
The father testified that he did not resign from YBL, but that he "just left" on October 15, 2002. The father admitted that he received his salary and benefits from the church until mid-November 2002.
The father paid $1,000 of his $1,500 monthly child-support obligation in November 2002. He paid $500 per month in child support for the months of December 2002, January 2003, and February 2003.
The father testified that he received only $1,200 in income from his real-estate business between the months of December 2002 and February 2003 and that, at the time of the hearing, he was working nights at Rich's department store, where he earned eight dollars an hour. The father testified that his second wife lost her job in December 2002.
The father and the second wife live in a home the second wife occupied before their marriage; the mortgage payment on that home is $855 per month. At the time of the hearing, the father's retirement account had a value of approximately $60,000. The father testified at the hearing that between December 2002 and February 2003 he had paid the mortgage payment for the home he shares with the second wife, as well as other household expenses, by removing money from his retirement account. The father admitted that he also could have met his child-support obligation during the months of November and December 2002 and January and February 2003 by borrowing additional amounts from his retirement account.
The mother testified that her gross income in 2002 was $113,762.85. She stated that she is a self-employed real-estate agent and that she has numerous business expenses. She testified that her adjusted gross income in 2002 was $64,110. The mother testified that she had paid all of the children's extracurricular-activity expenses since the parties' divorce. She stated that she asked the father several times to pay for some of those expenses but that he would tell her that he had no money and that she would have to take him to court. The mother testified that after a while she "knew there was no way to get it from him."
The mother stated that the children's extracurricular-activity expenses since the divorce amounted to $6,800 and that the father was responsible for half of those expenses. The mother stated that the father had refused her oral requests to pay his share of those expenses. The mother testified that she did not present the father with written bills for those expenses because he had told her that he would only pay the bills if she took him to court. The *Page 986 
father testified that the mother never sent him any bills for the children's extracurricular activities and that he was only given one medical bill pertaining to dental work for one of the children; he testified that he paid that bill. The father later admitted that he told the mother to "take him to court," but he stated that it was the mother's duty to present him with a written bill for any expenses for which she thought he should be responsible because "maybe [he] would have changed [his] mind" regarding paying for those expenses. He admitted, however, that he had not given the mother any indication that he would pay the bills.
The mother also asked the trial court to order the father to pay his share of the tutoring expenses for one of the children. The mother testified that she had paid $480 in tutoring fees for the parties' middle child, who has a learning disability. The mother testified that she was currently paying the tuition at Briarwood Christian School for two of her children to attend. The third child attends a public school. The mother stated that she had no savings account but that she did have an individual retirement account.
The father argues on appeal that the trial court erred in refusing to modify his child-support obligation because, he alleges, he established a material change of circumstances that warranted relief. He also contends that the trial court improperly imputed income to him in denying his petition to modify his child-support obligation. In her brief on appeal, the mother argues that the trial court correctly decided to impute income to the father based on his underemployment.
In its March 3, 2003, judgment the trial court found
 "that there has been no material change in circumstances that would warrant any reduction in child support obligations. The Court further finds that although the Defendant's income has decreased since his resignation [from] the Young [Business] Leaders of Birmingham, this reduction in income is due to the voluntary action of the Defendant and the Court will impute the amount of income that he was earning at the time of the final Judgment of Divorce as stated by the Defendant in his CS-41 form submitted with the Final Judgment of Divorce."
Where a trial court receives ore tenus evidence, its judgment based on that evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court abused its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ.App. 1995). "Th[is] presumption of correctness is based in part on the trial court's unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor." Littleton v.Littleton, 741 So.2d 1083, 1085 (Ala.Civ.App. 1999). This court is not permitted on appeal to reweigh the evidence and substitute its judgment for that of the trial court. Somers v. McCoy,777 So.2d 141 (Ala.Civ.App. 2000).
Under Rule 32(B)(5), Ala. R. Jud. Admin., a trial court "shall" impute income to a parent and calculate his or her child-support obligation based upon that parent's potential income if "the court finds that [the] parent is voluntarily unemployed or underemployed." This court, noting that the language of Rule 32 is mandatory, has held that where a trial court finds a parent to be voluntarily unemployed or underemployed, it is required to impute income to that parent. T.L.D. v. C.G., 849 So.2d 200,206 (Ala.Civ.App. 2002). However, the determination of whether
a parent paying child support is *Page 987 
voluntarily underemployed or unemployed is discretionary with the trial court. Mitchell v. Mitchell, 723 So.2d 1267 (Ala.Civ.App. 1998).
In this case, the trial court determined that the father lost his position with the YBL due to his "voluntary action." It is undisputed that the father's employer, upon learning that the father intended to remarry, requested that the father not schedule his wedding for approximately four months so that the church council could discuss the matter. The father made a deliberate decision not to follow his employer's request; instead, he hid his remarriage from his employer for approximately a month. The father testified at the hearing as follows:
 "Q: And the reason you were terminated was because you remarried; is that correct?
 "A: The exact statement was — we remarried — I remarried first of August, let that be known in early September and the exact statement was it is because you did not tell us that you remarried that we are asking you to resign.
". . . .
 "Q. . . . So, prior to you even thinking about getting married you knew that the church wanted you to get — not get married until December, correct?
"A. Correct.
 "Q. They told you to postpone any wedding until December, correct?
"A. Correct.
 "Q. You hadn't even decided on a wedding at that point?
"A. Correct.
 "Q. And then he said — the question was did he tell you why he wanted you to wait until December and what was your answer?
"A. So the church committee would approve.
"Q. So the church committee would approve?
"A. Uh-huh.
 "Q. So, you knew that if you waited until December of that year the church committee would approve your marriage, correct?
"A. Possible.
 "Q. You didn't say possible, you said they would approve.
"A. Well, possible. That's my statement.
"Q. No, that wasn't your statement in the deposition.
"A. Well — "
(Emphasis added.)
The father also testified as follows:
 "Q. And I asked you — you were in this deposition, the question was, did you consider how the marriage would affect your position and you answered yes. Then the question was and you felt it was in your best interest to go ahead and get married at that time. And your answer was yes. Correct?
"A. Uh-huh.
 "Q. Now because of your decision — because of this decision that you made you no longer have this income, correct?
"A. Correct."
During his presentation of evidence, the father answered in the affirmative to the question: "And your career, as far as in the ministry, had been ruined by your divorce, is that correct?" Thus, even though, according to the father's testimony, his career was purportedly "ruined" by the parties' divorce, the church had continued to employ the father at the same compensation level, albeit at a different position, that he had earned during his first marriage. Thus, after the parties' *Page 988 
divorce, the father retained the earning ability to support the parties' children.
Judge Murdock states in his dissenting opinion that the father miscalculated the church's reaction to his remarriage and the effect the remarriage would have on the father's continued employment with the church. 895 So.2d at 991. However, the evidence in the record on appeal would support a determination by the trial court that the father did not miscalculate the church's reaction to his remarriage. It is the province of the trial court, as the factfinder, to assess the credibility of the witnesses that testify before it; "[a]ppellate courts can only review the record." Ex parte Drummond, 785 So.2d 358, 363 (Ala. 2000). The trial court could have concluded that the father was not credible when he testified that he did not believe he would lose his employment if he did not comply with the church's request that he wait to schedule his wedding. The fact that the father concealed his remarriage from the church tends to support such a conclusion.
The father decided to marry his second wife in secret instead of waiting four months, as requested by his employer. Had the father waited until December to remarry, as the church officials had requested, and the church had still asked him to resign, the trial court, or this court, might have reached a different result in this case. However, the father did not do so. The father chose the timing of his marriage while knowing that the timing of the marriage might cost him his job and his ability to support his three children. Thus, there is evidence in the record that tends to support a conclusion that the father's actions that resulted in his underemployment were voluntary. Whether we agree with the action taken by the church or with the decision of the trial court, we cannot say that the trial court's finding that the father's conduct in "leaving" his employment was a voluntary action was plainly or palpably wrong. Because the evidence supports the determination that the father was voluntarily underemployed, we must affirm the trial court's decision to impute income to the father. T.L.D. v. C.G., supra (if a parent is voluntarily unemployed or underemployed, the trial court must impute income to the parent under Rule 32).
In holding that the trial court did not err in its decision to impute income to the father, we must necessarily conclude that the father did not present evidence of a change in circumstances that would necessitate granting his petition to modify his child-support obligation. In further support of this conclusion, we note that the father presented evidence only that he had not earned from his newly chosen real-estate career income equivalent to the income that he had earned while employed by the church. Other than the general assertion that his career in the ministry had been "ruined" by his divorce,[1] the father did not present any evidence pertaining to his ability to obtain a position with another church or what amount of income he could expect to earn working for a religious institution or some other employer. While Judge Crawley might very well be correct in surmising in his dissenting opinion that the situation surrounding the divorce and the father's marriage to the second wife "was undoubtedly a high-profile case" and that the father's job opportunities in "local ecclesiastical circles [are] limited or nonexistent," the father himself did not attempt to present evidence *Page 989 
to support those assertions. 895 So.2d at 990. In reviewing this case, this court is confined to the evidence in the record on appeal, Old Southern Life Insurance Co. v. Spinato,57 Ala.App. 416, 329 So.2d 106 (Civ. 1976), and it may not speculate about the existence of the father's probable earning capability or take judicial notice of such purported facts.[2] This court must determine whether the trial court's factual findings are supported by the evidence, not whether other findings might be.
This court has stated that a finding that a parent is underemployed "mandates application of the [child-support] guidelines using the income the underemployed parent is capable of earning." Herboso v. Herboso, 881 So.2d 454, 457
(Ala.Civ.App. 2003). In Herboso v. Herboso, this court affirmed the trial court's finding that the husband was voluntarily underemployed, but, unlike in this case, it reversed the trial court's decision, based solely on the finding of voluntary underemployment, to deviate from the Rule 32 guidelines in establishing the husband's child-support obligation. Herboso v.Herboso does not affect the premise that, as the fact-finder, the trial court, not this court, was in the best position to determine from the evidence presented to it the level of income the father is capable of earning.
This case is not an original divorce action; rather, it involves, among other things, a petition to modify child support. The burden was on the father, as the party seeking that child-support modification, to establish a change of circumstances that justified the modification of his child-support obligation. Beavers v. Beavers, 717 So.2d 373,376 (Ala.Civ.App. 1997) (affirming the trial court's denial of the mother's petition to modify child support where the mother presented no evidence to rebut the father's testimony regarding his income); cf., Harris v. Harris, 590 So.2d 321, 322-23
(Ala.Civ.App. 1991) (in reversing the child-support and alimony provisions of a judgment in an original divorce action, this court stated that the mother had not presented evidence to contradict the father's evidence regarding his income). We must conclude that the father has failed to demonstrate that the trial court erred in refusing to modify his child-support obligation. Therefore, we affirm the trial court's judgment as to that issue.
The father also argues that the trial court erred as a matter of law by effectively punishing him for exercising his right to association, i.e., his right to marry. In making this argument, the father cites to general authority regarding the right to association. The cases the father cites involve statutes or regulations that attempt to prevent certain associations. SeeRoberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244,82 L.Ed.2d 462 (1984); Zablocki v. Redhail, 434 U.S. 374,98 S.Ct. 673, 54 L.Ed.2d 618 (1978); Parks v. City of WarnerRobins, Georgia, 43 F.3d 609 (11th Cir. 1995). However, the father does not make any argument that the trial court's action is a state action similar to the statutes or regulations at issue in the cases he cites in his brief, nor does he make any argument attempting to apply the specific law set forth in those cases to the facts of this case. This court may not "create legal arguments for a party based on undelineated general propositions unsupported by . . . argument." Spradlin v. Spradlin,601 So.2d 76, 79 (Ala. 1992). The *Page 990 
father has failed to demonstrate error with regard to this issue; therefore, we affirm the trial court's judgment as to this issue.
The appellee's request for an attorney fee is denied.
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
CRAWLEY and MURDOCK, JJ., dissent, with writings.
[1] We note that the father did not testify regarding whether or how his remarriage had affected his career prospects.
[2] "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Rule 201(b), Ala. R. Evid.