THOMAS, Judge.
Keith Joel Thomson (“the husband”) appeals a judgment of the Jefferson Circuit Court (“the trial court”) that, among other things, awarded Karen Acton Shepard (“the wife”) alimony in gross and child support for the maintenance of the parties’ two sons (“the children”), born on May 30, 2004, and April 4, 2006, respectively. We affirm the trial court’s judgment.
Background
The parties were married in 2002. The wife filed a complaint in the trial court on April 30, 2014, seeking a divorce from the husband, custody of the children, child support, alimony, and a division of the marital property. The husband answered the wife’s complaint, and, after additional filings and orders, the wife filed a verified petition requesting that the trial court ap *630 point a guardian ad litem to: protect the interests of the children because, she averred, the husband had been inappropriately-involving them in the divorce litigation. The trial court thereafter entered an order appointing a guardian ad litem for the children and requiring each party to deposit with the circuit-court clerk a retainer of $750 for the guardian ad htem’s services. The trial court received evidence regarding, the wife’s complaint on several separate days, beginning in March 2015 and ending in October 2015. On December 1, 2015, the trial court entered an order requiring each party to pay the guardian ad litem $7,387.50 for her services. The parties thereafter submitted payment to the guardian ad litem, and the trial court granted the guardian ad litem’s motions to condemn those payments.
On January 5, 2016, the trial court entered a judgment divorcing the parties in which it, among other things, awarded the parties joint legal custody of the children, named the wife as the “primary” physical custodian, scheduled the parties’ custodial time, ordered the husband to pay the wife $1,500 per month for each child as child support, ordered the husband to maintain health insurance for the children, ordered the husband to pay $1,000 per month as periodic alimony, and divided the marital property. Each party filed postjudgment motions pursuant to Rule 59, Ala. R. Civ. P. In her postjudgment motion, the wife requested that the trial court alter or amend particular provisions of its judgment regarding the husband’s custodial time and the children’s health insurance, and, in his postjudgment motion, the husband requested that the trial court alter or amend particular provisions of its judgment regarding child support, his custodial time, and the division of a certain retirement account. The trial court set the parties’ postjudgment motions for a hearing to be conducted on February 8, 2016.
On February 22, 2016, the trial court entered an “amended final judgment of divorce” in which it altered, among other things, particular provisions, of its judgment regarding custody of the children, the parties’ responsibilities for the children’s medical expenses, and the husband’s periodic-alimony obligation, awarded the husband “full right and title to” his retirement accounts, awarded the husband his “individual or business- accounts” as separate property, and awarded the wife $100,000 as a “monetary property settlement.” On March 7, 2016, the -wife filed a “motion to amend and/or correct the amended final judgment of divorce pursuant to Rule 60(a)[, Ala. R. Civ. P.].” The husband thereafter filed an objection to the wife’s motion in which he argued that her motion had not'been limited to a request that the trial court correct clerical errors under Rule 60(a) and that her motion should have therefore been construed as an improperly filed successive Rule 59, Ala. R. Civ. P., motion.
That same' day, the husband also filed a postjudgment motion in which he requested, among'other things, that the trial court amend its February 22, 2016, order to award the parties joint legal and physical custody of the children and “clarify a certain provision regarding the children’s medical expenses. The husband also contended that the trial court’s award of child support in the amount of $1,500 per child and its award of $100,000 to the wife as a “monetary property settlement” were not supported by the evidence presented.
On March 28, 2016, thé trial court entered an orderin which it stated:
“THE COURT, ex mero mbtu, is of the opinion that the following Order shall be entered....
“1, That the Amended Final Judgment entered by this court on February *631 22, 2016 ... is hereby set aside and held for naught.
“2. That the Final Judgment entered by this court on January 5, 2016 ... is hereby reinstated.
“3. That the [wifej’s Motion to Amend And/Or Correct the Amended Final Judgment of Divorce Pursuant to Rule 60(a), the [husbandj’s Objection to Amend/And Or Correct the Amended Final Judgment of Divorce Pursuant to Rule 60(a), and [the husbandj’s Motion to Alter, Vacate or Amend the Amended Final Judgment of Divorce are Moot.”
That same day, the trial court also entered an order modifying the provisions of its January 5, 2016, judgment regarding custody of the children and child support and awarding the husband the full value of his retirement accounts and the wife $100,000 as alimony in gross. The trial court’s order further stated “[tjhat all other provisions of the Final Judgment [of] Divorce entered on January 5, 2016[,j shall remain in full force and effect.”
The husband filed a notice of appeal on April 4, 2016. On appeal, the husband argues that the trial court erred in various respects. However, as a threshold matter, we must first determine from which of the trial court’s orders the husband has appealed.
Analysis
In his appellate brief, the husband states:
“This is a procedurally unusual, indeed, almost confounding case. There was a final judgment of divorce followed by three post-judgment orders which in some manner altered the previous order. ... [The husband] believes the correct analysis is that the March 28 ex mero motu order is void and that the final judgment in this case is the February 22 Amended Judgment.”
In light of his concerns, the husband’s appellate brief addresses in alternative fashion what he contends are errors in both the trial court’s February; 22, 2016, order and its March 28, 2016, orderp. In her appellate brief, the wife responds: .
“The trial court was vested with the authority and jurisdiction to enter the Order of March 28, 2016[,j setting aside the Amended Judgment dated February 22, 2016[,j and reinstating the Final Judgment of Divorce dated January 5, 2016[,j as modified by a second March 28, 2016[,j Order. The Final Judgment dated January [6], 2016[,j as modified is the operative final judgment applicable to the parties and this appeal.”
We first note that the husband’s notice of appeal was timely filed on April 4, 2016, whether his appeal was taken from the trial court’s February 22, 2016, order or its final March 28, 2016, order and that he has therefore properly invoked this court’s subject-matter jurisdiction. See Rule 4, Ala. R. App. P.
We next consider whether, as the husband contends, the trial court’s March 28, 2016, orders were void and- whether his appeal was therefore taken from the trial court’s February 22, 2016, order. In support of his conclusion, the husband argues that the trial court’s February 22, 2016, order ruled upon the parties’ post-judgment motions that were pending at that time, that the trial court primarily granted the relief that he had requested in his postjudgment motion, and that, thus, he concludes, the trial court’s February 22, 2016, order also denied the relief that the wife had requested in her postjudgment motion. Citing, among other cases, Pinkerton Security and Investigation Services, Inc. v. Chamblee, 961 So.2d 97, 101-02 (Ala. 2006), the husband argues that the trial court lost subject-matter jurisdiction over the action when it denied the wife’s postjudgment motion and, therefore, could not have properly entered its March 28, 2016, orders ex mero motu. In her appellate brief, the wife responds:
*632 “While the Trial Court did state in one of its Orders of March 28, 2016, that the Order was ‘ex mero motu,’ ... that Order was, in fact, in response to timely filed pending motions from both parties .... The ‘[wifej’s Motion’ and the ‘[husband]’s Objection’ and ‘Motion’ were ‘moot’ only because the Trial Court entered its Modified Judgment of Divorce ... which in fact addressed the pending motions.... This is not a situation where there were no post-trial motions, and the trial court, on its own and not in response to any then pending motion or motions, entered an order in March correcting a prior order in January.”
In his reply brief, the husband responds:
“[One of the trial court’s March 28, 2016, orders] explicitly denies that it was based on motions filed by either party after February 22nd because it holds that the motions filed by the [w]ife and [the h]usband were moot and not a basis for the ex mero motu order.
“The Third Order (March 28) is more than 30 days after the Second Order (February 22) which it set aside and held for naught. The trial court unquestionably had no jurisdiction to enter an ex mero motu order on March 28, 2016[,] setting aside a February 22, 2016[,] order because it was more than 30 days after the February 22nd order and was not based on any post-judgment motions. See Vann v. Cook, [989 So.2d 556, 559 (Ala. R. Civ. App. 2008)].”
The husband’s conclusion is wrong because it is derived from an incorrect premise. “[A] trial court retains the power to correct sua sponte any error in its judgment that comes to its attention during the pendency of a party’s Rule 59(e) motion to alter, amend, or vacate the judgment, regardless of whether the error was alleged or not in the motion.” Henderson v. Koveleski, 717 So.2d 803, 806 (Ala. Civ. App. 1998)(emphasis added). After the trial court entered its February 22, 2016, order, the husband filed his post-judgment motion on March 14, 2016. The trial court’s March 28, 2016, orders were therefore entered during the pendency of the husband’s postjudgment motion, and the trial court retained the power to correct errors in its judgment on its own initiative during that time, regardless of whether the husband had alleged those errors in his postjudgment motion.
The trial court chose to correct what it determined to be errors in its judgment by setting aside its February 22, 2016, order and reimplementing the provisions of the January 5, 2016, judgment, subject to certain modifications that it deemed appropriate and set out in a separate order. We see no inherent error in the trial court’s decision to amend its judgment in this fashion. Indeed, the husband concedes in his appellate brief that, “[i]n most respects, the Amended Judgment entered February 22, 2016[,] and the re-instated and modified January 5, 2016[,] order pursuant to the March 28, 2016[,] order are identical.” Thus, we conclude that the trial court properly exercised its subject-matter jurisdiction over the action when it entered its March 28, 2016, order modifying certain provisions of its January 5, 2016, judgment, and the husband’s timely appeal properly invoked this court’s subject-matter jurisdiction to review the trial court’s divorce judgment, as amended by the March 28,2016, order.
We next turn to the husband’s substantive appellate arguments. The husband argues that the trial court erred by appointing the guardian ad litem, by ordering the parties to pay her fee, and by failing to follow the child-support guidelines set forth in Rule 32, Ala. R. Jud. Admin. He also argues that the trial court’s awards of child support and alimony in gross were unsupported by the evidence.
*633 The husband first argues that the trial court erred by appointing the guardian ad litem and ordering him to pay a portion of her fee. “Generally, a trial court has the authority to appoint a guardian ad litem to represent a child in a divorce proceeding and to order a reasonable fee to be paid for the guardian ad litem’s services. See § 26-2A-52, Ala. Code 1975, and Rule 17, Ala. R. Civ. P.” Roberts v. Roberts, 189 So.3d 79, 81 (Ala. Civ. App. 2015). The husband has developed no meaningful argument in support of his assertion that the trial court erred by appointing the guardian ad litem. “When an appellant fails to properly argue an issue, that issue is waived and will not be considered.” Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala. Civ. App. 1996).
Citing, among other cases, Cochran v. Cochran, 49 Ala.App. 178, 269 So.2d 884, 896 (1970), overruled on other grounds, the husband also specifically argues, however, that the trial court’s appointment of the guardian ad litem was not mandatory and that “it [wa]s error to impose a guardian ad litem fee upon a party to litigation where the appointment of a guardian ad litem [wa]s not required.” However, the record shows that the husband did not argue to the trial court that it had erred by ordering him to pay a portion of the guardian ad litem’s fee. “This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.” Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992). Thus, we cannot reverse the trial court’s judgment for that reason.
The husband next argues that the trial court erred by failing to follow the child-support guidelines set forth in Rule 32, Ala. R. Jud. Admin. Citing, among other cases, Farnell v. Farnell, 3 So.3d 203, 206 (Ala. Civ. App. 2008), he specifically contends that the trial court’s failure to follow the child-support guidelines, or, alternatively, to explain why it did not follow the child-support guidelines, constituted reversible error. In its judgment, the trial court ordered the husband to pay to the wife $1,500 “per month per child for the support and maintenance of the minor children” and stated: “The Child support herein was not determined by application of the child support guidelines established in Rule 32, [Ala. R. Jud. Admin.,] as the [husbandj’s income exceeds the Child support guidelines.”
The husband cites Rule 32(A), Aía. R. Jud. Admin., and contends: “This conclusionary statement is not an adequate ‘written finding on the record indicating that the application of the guidelines would be unjust or inappropriate.’ ” However, the husband’s argument ignores Rule 32(C)(1), Ala. R. Jud. Admin., which states, in pertinent part: “The court may use its discretion in determining child support in circumstances where combined adjusted gross income ... exceeds the uppermost level of the schedule.” Because it determined that the husband’s adjusted gross income exceeded the uppermost level of the child-support guidelines, the trial court was authorized to use its discretion when calculating child support, and its judgment cannot be reversed simply because it did not make a written finding that abiding by the child-support guidelines would be unjust or inequitable. See Derie v. Derie, 689 So.2d 142, 145 (Ala. Civ. App. 1996)(“[T]he employment income of the parents placed the determination of the child support obligation beyond the scope of the guidelines; therefore, it is unnecessary for the trial court to make any written finding regarding why the guidelines would be unjust or inappropriate.”).[1]
*634 The husband next argues that the trial court’s child-support award was not supported by sufficient evidence regarding the children’s needs or his ability to pay;
“Under the well-established ore tenus rule, the trial court’s judgment is presumed correct; this court will not reverse the judgment absent a showing that the trial court’s findings are plainly and palpably wrong or that the trial court abused its discretion. Tompkins v. Tompkins, 843 So.2d 759, 764 (Ala. Civ. App. 2002). Moreover, matters relating to child support ‘rest soundly within the trial court’s discretion, and will not be disturbed on appeal absent a showing that the ruling is not supported by the evidence and thus is plainly and palpably wrong.’ Bowen v. Bowen, 817 So.2d 717, 718 (Ala. Civ. App. 2001).”
Scotty. Scott, 915 So.2d 577, 579 (Ala. Civ. App. 2005).
“When the parties’ combined income exceeds the uppermost limit of the child-support schedule, the determination of a child-support obligation is within the trial court’s discretion. Floyd v. Abercrombie, 816 So. 2d 1051, 1057 (Ala. Civ. App. 2001); Dyas v. Dyas, 683 So.2d 971 (Ala. Civ. App. 1995). ‘[A] trial court’s discretion is not unbridled and ... the amount of child support awarded must relate to the reasonable and necessary needs of the children as well as to the ability of the obligor to pay for those needs.’ Dyas v. Dyas, 683 So.2d at 973.”
McGowin v. McGowin, 991 So.2d 735, 741 (Ala. Civ. App. 2008).
Regarding the children’s needs, we note,the following testimony from the wife when asked. about the “average monthly cost .... for the, running of [her] household”: “I can tell you what it has been which is about, not including the things that [the husband’s] father pays for, about three thousand, or four thousand, five thousand dollars a month.” She also testified that “[the husband] gave [her]—frequently gave [her], probably weekly, gave [her] a gift card to Whole Foods for $500 and [she] would use that to .buy [their] groceries.” The husband’s testimony and credit-card statements that were admitted into evidence also support the trial court’s conclusion, that the parties’ monthly expenses averaged at least $3,000.
For instance, the husband offered as evidence a list that reflected grocery expenses for each month in 2014 and testified that those amounts represented the amounts that he had spent on “food for the family for those weeks.” When the amounts are totaled, that list indicates that the husband spent an average of more than $600 per month for groceries during 2014. Furthermore, summaries of the husband’s credit-card expenses for 2012, 2013, and 2014 were admitted into evidence, and the annual totals of those expenses were $51,500.61, $83,949.74, and $214,821.23, respectively. The husband testified that he used that credit card for business, personal items, and “family or household expenses.” Based on the evidence before it, we cannot conclude that the trial court’s determination that $3,000 per month represented expenses that were related to the reason *635 able and necessary needs of the children was plainly and palpably wrong such that its judgment should be reversed for that reason.[2]
Regarding the husband’s ability to pay, we note that the husband testified that he was a professional writer, and the wife testified that she was unemployed throughout the marriage and that she had remained so during the pendency of the divorce action. Rule 32 provides child-support guidelines for combined adjusted gross income totaling, at the uppermost limit, $20,000. Thus, the question is whether the trial court’s finding that the husband’s monthly income exceeded $20,000 was supported by sufficient evidence. The husband argues that it was not, and he notes that the trial court’s finding regarding his income contradicts the information that he provided in .his Form C£f-41, in which he averred that his average monthly gross income from 2011. through 2015 was $5,839.03. In response, the wife contends that, in addition to the income noted by the husband in his Form CS-41,'the trial court properly considered investment income, capital gains, and gifts from the husband’s father when determining the husband’s monthly income. See Rule 32(B)(2)(a), Ala. R. Jud. Admin.
The parties’ joint federal income-tax returns from 2011, 2012, and 2013 were admitted into evidence and indicated that, for those years, they had reported an annual income of $83,394, a loss of $8,510, and an annual income of $20,658, respectively. The parties’ draft Form 1040 for 2014 was also admitted into evidence, which the husband testified that the parties intended to file jointly. The parties’ draft Form 1040 for 2014 indicated that they intended to report a gross income $155,050 for that period, an amount that included wages, dividends, capital gains, and income from an S corporation. The wife also testified that, after reaching the age of 50 in April 2015, she had obtained unrestricted access to funds totaling $220,000 that had previously been held in trust through a fund that had been created by her parents.
The husband testified that he did not earn a regular salary and that, “the vast majority of time,” he worked on behalf 20th Century Hound Entertainment Corporation (“20th Century Hound”), an entity that he had created and of which he was the sole shareholder.[3] Upon his completion of various contractual writing projects, the husband testified, 20th Century Hound would receive payment for those projects and a portion of his income was paid from those funds. Regarding those funds, the husband gave the following testimony upon examination by his attorney:
“Q. Now, [the wife] testified that 2009-2012 you didn’t have a salary. You got'a check for twenty dollars every so often. 2009 to 2012 what was the source of your monies—was it true that you didn’t have any income coming in at that time?
“A. No, sir.
“Q. What was the source of your money at that time?
*636 “A. Writing magazine articles and books.
“Q. And during that time period did you get paid for any book?
“A. Yes, sir. Once a Spy, Twice a Spy and I am not sure whether Seven Grams of Lead was in that period or subsequent. Probably that period.
“Q. How were you paid?
“A. They sent a check to my talent agency and talent agency takes out then-commission and sends a check to me.
“Q. And what was the total that you were paid during that time?
“A. Between—around [$700,000].
[[Image here]]
“A. They went—my corporation I should say received the money. So my d/b/a 20th Century Hound account at Alliance Bernstein.
“Q. And what is Alliance Bernstein.
“A. It is a bank.
“Q. Now, was that money you were living off during 2009 to 2012?
“A. For the most part, yes, sir.”
An account summary was also entered into evidence that the husband testified had been provided by “Alliance Bernstein.” The summary included nine accounts, four of which were maintained for the benefit of the children; the combined balance of those accounts totaled approximately $414,698. Almost the entirety of that balance was composed of savings for the children’s college education that had been primarily deposited by the husband’s father. The husband’s remaining five accounts were composed of retirement and investment accounts. As of October 13, 2015, the combined balance of those accounts was $1,231,873, and the record indicates that the husband had withdrawn approximately $50,000 from an investment account during the pendency of the divorce action, leaving a remaining balance of $875,360 in that account. The husband also testified that, since 2012, his father had effectively loaned him approximately $846,168, much of which had been accumulated by the husband’s use of credit cards, the balances of which had been paid by his father. An “amended, restated, and consolidated promissory note” that had been executed on June 4, 2015, was admitted into evidence as proof of the husband’s intention to repay that debt to his father no later than March 2038.
“[T]he amount of the f[ormer husband]’s gross income under Rule 32 is a matter to be determined by the trier of fact.” Hood v. Hood, 23 So.3d 1160, 1165 (Ala. Civ. App. 2009). Furthermore, “[the Rule 32] guidelines require the trial court to consider the resources of the parents, not simply their incomes, in making a determination of child support.” Ex parte St. Clair Cty. Dep’t of Human Res., 612 So.2d 482, 483 (Ala. 1993). The record clearly supports the conclusion that the parties had access to substantial assets and that the husband had demonstrated an ability to earn a substantial income during the marriage. Additionally, to the trial court, the husband’s willingness and ability to withdraw $50,000 from his investment account during the pendency of the divorce action could have weighed against concluding that his assets were so illiquid that he was financially unable to continue paying $3,000 per month for the maintenance of the children. In short, we cannot conclude that the trial court’s child-support award was so unsupported by the evidence that it was clearly erroneous or an abuse of discretion, and we cannot reverse its judgment for that reason.[4]
*637 Finally, the husband argues that the trial court’s award of $100,000 to the wife as alimony in gross was unsupported by the evidence.
“Our standard of review of issues charging abuse of discretion in the awarding of alimony in gross or division of property is time-worn, but unchanged, in thousands of cases. That standard is that the judgment of a trial judge rendered after hearing evidence presented ore tenus is presumed correct on appeal and will not be reversed unless it is so unsupported by the evidence as to be unjust and a palpable abuse of judicial discretion.”
McDaniel v. McDaniel, 621 So.2d 1328, 1329 (Ala. Civ. App. 1993).
“The only limitation on that discretion .is that the division of property be equitable under the circumstances of the particular case, and the task of determining what is equitable falls to the trial court. Ross v. Ross, 447 So.2d 812 (Ala. Civ. App. 1984).... In making the division, the trial court may consider several factors, including the parties’ respective present and future earning capacities, their age and health, their conduct, the duration of the marriage, and the value and type of .marital property. Lutz v. Lutz, 485 So.2d 1174 (Ala. Civ. App. 1986).”
Cantrell v. Cantrell, 773 So.2d 487, 489-90 (Ala. Civ. App. 2000)(emphasis added). In support of his argument, the husband asserts that
“[t]he entire proven marital estate has a value of slightly more than $500,000.00. When [the w]ife was" awarded the [marital home][5] an automobile,’ and a portion of the household goods she had been awarded practically all of the marital estate. To award her more than she has already been awarded in the form of $100,000.00 as alimony in gross would be an inequitable division of marital property -in addition to being an award that exceeds the marital estate.”
In its January 5, 2016, judgment, the trial court had ordered the husband to pay the wife one-half of a certain retirement account. That provision was modified by the trial court’s March 28, 2016, order, and the husband was awarded- “full right and title to” his retirement accounts. In its-March 28, 2016, order the trial court also stated that “[the h]usband’s individual or business accounts ... are confirmed in [the h]us-band’s name as his sole and separate property and [the w]ife is divested of any interest she may have therein.”
However, the record indicates that the husband had deposited at least some revenue received by 20th Century Hound into his accounts for his sole benefit during the marriage. We -note the following exchange that took place between the- husband and the wife’s attorney regarding some of those transactions:
*638 “Q. Now, is this the account that receives most of the time payments from the publishing companies for your work?
“A. I believe so.
“Q. And from this account when it receives money you have the power to direct where the money goes given normal regular business practices and capabilities; isn’t that correct? •
“A. Yes, sir.

it

“Q. And in November 2014 from Sanford Bernstein what were the opening and closing balances? '
“A. Opening balance [$41,823]. Closing balance [$0], I am sorry. [$91,912].
“Q. And what do you attribute the- increase in that month?, , -
“A. Probably the [$50,000]- for the completed accepted manuscript,
“Q. For a book you. are writing or participating in?
“A. Yes, sir.
“Q. And the next month, December 31, "2014 shows the opening balance [$91,-912] and then closing balance [$43,250]. Do you see that?
“A. Yes, sir.

((

“Q. ... And within the month of December there was a [$16,250] deposit to the retirement account for you. And [$32,-433] to an investment account for you in your name?
“A. Yes, sir.”
In other words, the husband’s testimony would support the conclusion that most, if not all, of the revenue that he had -generated by completing various writing projects during the marriage had been deposited into a business account over which he exercised complete control and through which he at least occasionally'directed investments for his sole benefit. As noted above, the combined balance of the-husband’s investment and retirement accounts as of October 13, 2015, was $1,231,873.
The record indicates that the husband possessed two retirement accounts, only one of which had been created during the marriage. The balance of that account on February 27, 2015, was $146,333 and had decreased during the pendency of the divorce action to. $137,949 on October 13, 2015. Furthermore, the husband offered as evidence a “cash flow summary” of his largest investment account that had been created in 1984. The “cash flow summary” indicated that the husband had contributed a net amount of $58,351 to that account during the marriage. Thus, the trial court could have concluded that the total value of the contributions that the husband had made to his retirement and investment accounts with income that' had been produced during the marriage was approximately $203,684 in February 2015.
Taking the husband’s valuation of the marital estate of approximately $500,000 to bé accurate, and taking into consideration the $220,000 that the wife testified that she had received in April 2015, the record indicates that the trial court could have concluded that the total value of the wife’s estate after its award of $100,000 as alimony in gross would be $820,000. As compared with the $1,231,873 combined balance of the husband’s investment and retirement accounts, the trial court could have determined that awarding the wife the marital home and $100,000 as alimony in gross would be equitable.
Alternatively, the trial court could have determined that $1,200,000 represented the total value of the substantial property the parties had acquired during the marriage and therefore concluded that awarding the wife $100,000 as alimony in gross in addition to the marital home, which had been valued at $500,000, would be both equal and equitable. As explained above, *639 the husband testified that he had earned approximately $700,00.0 during the marriage for the completion of major writing projects, and when asked, “[W]as that money you were living off during 2009 to 2012?,” the husband responded, “For the most part, yes, sir,” However, the extent to which the husband had actually paid the parties’ living expenses during the marriage was disputed. For instance, we note the following testimony from wife regarding the parties’ monthly expenses:
“[The wife’s attorney]: While we were [ (sic) ] are on the subject of money, how were bills paid? What was the normal routine regarding handling of the money during the marriage?
“[The wife]: I think the writing of the monthly bills, the utilities and the insurance and car insurance, home insurance was paid in a lump sum once a year and [the husband] handled that. I believe it came from his father.”
The trial court could have further concluded that the husband’s own testimony corroborated the wife’s testimony regarding his father’s payment of their living expenses. As already mentioned, copies of the husband’s credit-card statements for 2012, 2013, and 2014 were admitted into evidence, and the annual totals of those expenses were $51,500(61, $83,949.74, and $214,821.23, respectively. Regarding his credit-card usage, the husband testified as follows' upon cross-examination by the wife’s attorney:
“[The wife’s attorney]: And who paid the bill for your usage of this credit card?
“[The husband]: My father.
“[The wife’s attorney]: And have you paid him back anything for that?
“[The husband]: Not yet.”
In other words, although the husband testified that the $700,000 sum that he had earned during the parties’ marriage had “for the most .part” been used to pay the family’s living expenses, the trial court could have determined that the husband’s father had actually historically borne much of that financial burden, thereby allowing the husband to substantially dispose of the $700,000 sum in any manner that he saw fit, including in a manner from which he would reap the sole benefit after the parties were divorced. In addition to the testimony referenced above regarding the husband’s contributions to certain private accounts, we note the following exchange that took place between the wife’s attorney and the husband specifically regarding certain installments of the $700,000 that he-had received:
“[The wife’s attorney]: Isn’t it true that you got [$170,000] ’at the time of signing?
“[The husband]: Probably so, yes, sir.
“[The wife’s attorney]: And when you got the [$170,000] what did you do with it, if you recall?
“[The husband]: I deposited it into my equity accounts,
“[The wife’s attorney]: So that was money earned during your marriage that went into your Alliance Bernstein account that you call the equities account?
“[The husband]: Yes, sir.

it

“[The wife’s attorney]: And when you receive the next payment of the [$100,-000] less whatever' the publisher took out for agents or whatever, what did you do with the money?
“[The husband]: It was deposited in the same account.
“[The wife’s attorney]: The equities account?
“[The husband]: The account 20 Century Hound, LLC, d/b/a at Alliance Bernstein.
[[Image here]]
*640 “[The husband]: Equities account is my umbrella term for my Alliance Bernstein account.
[[Image here]]
“[The wife’s attorney]: So you are calling all of your accounts at Alliance Bernstein your equities accounts?
“[The husband]: Yes, sir.
[[Image here]]
“[The wife’s attorney]: And if I have got it clear when you receive money you say it goes into an account under the name of 20th Century Hound?
“[The husband]: Yes.
“[The wife’s attorney]: And from that account it goes to other places for use to whatever you wish to apply it to, paying expenses or investing or whatever?
“[The husband]: Yes, sir.”
(Emphasis added.)
We note that the ultimate disposition of the entire $700,000 the husband had received is not expressly disclosed in the record. However, it was undisputed that he had received the $700,000 and that he had decided the purpose to which it was put. Thus, the trial court could have concluded that, through their joint efforts, the parties had acquired substantial property during their marriage totaling approximately $1,200,000 and therefore determined that awarding the wife the marital home, valued at approximately $500,000, and requiring the husband to pay an additional $100,000 as alimony in gross would both equally and equitably divide the marital property by awarding the wife one-half of the value of the substantial property that the parties had acquired during the marriage.
Citing Culver v. Culver, 199 So.3d 772, 779 (Ala. Civ. App. 2016), the dissent concludes that, “although the husband has a sizeable separate estate, that fact does not give the trial court discretion to award him an inequitable portion of the marital property.” 225 So.3d at 642. We agree. However, the record supports our conclusion that the trial court did not base its decision to award the $100,000 to the wife solely on the size of the husband’s separate estate but, rather, on all the evidence presented, including the evidence regarding the substantial property that the parties had acquired during their marriage, the husband’s testimony regarding his ability and willingness to dispose of significant portions of that property for his own benefit, and the evidence presented regarding the husband’s ability to prevent the wife from using or accessing that property during their marriage, at least in part due to the financial support provided by his father.
The parties’ actions toward one another and the events leading to their divorce were disputed. The wife testified that she had obtained a master’s degree in film production in 1995 but had been unemployed during the marriage. The husband was a successful author who was working on another project at the time of trial. Based on the parties’ earning abilities and the disparate value of their respective assets, we cannot conclude that the trial court’s determination that an award of $100,000 to the wife as alimony in gross would serve equity was so unsupported by the record such that it is plainly and palpably wrong and its judgment should be reversed.
Furthermore, a variety of inferences can be drawn from the record, and the evidence presented is subject to multiple interpretations. However, as is ably demonstrated by the facts of this case, interpreting the evidence and making inferences based on the evidence rightfully fall within the scope of the duties that the trial court has been obligated to perform by § 30-2-51, Ala. Code 1975, and this court is in no position to substitute its judgment for the trial court’s resolution of such factual issues unless its determinations are clearly incorrect. Because we *641 conclude that the husband has not demonstrated such error here, we decline the opportunity to reverse its judgment in this case. See Clements v. Clements, 990 So.2d 383, 392 (Ala. Civ. App. 2007)(“This court cannot hold that the trial court’s award of alimony and the division of the marital property was plainly or palpably wrong, because there was evidence in the record from which the trial court could have reasonably determined that the alimony and division of marital property was equitable under the circumstances of this case.”). Accordingly, the trial court’s judgment is affirmed.
AFFIRMED.
Thompson, P.J., and Pittman and Donaldson, JJ., concur.
Moore, J., concurs in part and dissents in part, with writing.

. The husband also cites State ex rel. Thomas v. Thomas, 575 So.2d 583, 587 (Ala. Civ. App. *634 1991), and contends that the trial court’s judgment should be reversed because the record does not contain a Form CS-42. However, this court has held that, where the record indicates that an award of child support comports with the evidence regarding the parties' incomes, we need not reverse a child-support order based solely on an absence of the forms outlined in Rule 32(E). See Barrett v. Barrett, 183 So.3d 971, 976 (Ala. Civ. App. 2015). As is further discussed below, the trial court’s child-support award was supported by sufficient evidence. Therefore, the absence of a Form CS-42 from the record does not constitute reversible error.

. At its uppermost level, Rule 32 provides for a child-súpport award of $2,140 for two children.

. 20th Century Hound’s Form 1120S for 2014 was admitted into evidence and indicated that it had received gross income of $102,178 and reported net income of $2,891 for that period. We note that the parties have not specifically cited, nor have they meaningfully addressed the effect, if any, of Rule 32(B)(3), Ala. R. Jud. Admin., on the proper calculation of the husband’s gross income. See Hurley v. Hurley, 980 So.2d 985, 988 (Ala. Civ. App. 2007)(“When a party’s income is from self-employment, ‘the relevant income is [the business’s] net income, not the [party’s] draw or salary,’ ” (quoting Brown v. Brown, 960 So.2d 712, 716 (Ala. Civ. App. 2006))). Thus, we decline- to reverse the trial court’s judgment on the basis of the instruction set forth in Rule 32(B)(3), See Asam, supra.

. The husband also cites Van Houten v. Van Houten, 895 So.2d 982, 986 (Ala. Civ. App. 2004), and argues that the trial court should have imputed income to the wife because she was voluntarily unemployed. There is no indication, however, that the trial court found the wife to be voluntarily unemployed. "[T]he de *637 termination of whether a parent ... is voluntarily underemployed or unemployed is discretionary with the trial court.” Id. at 986-87. Furthermore, based on the record before this court, we cannot definitively say that the trial court did not consider the wife’s resources or earning ability when setting the child-support award. As noted above, the wife testified that the family's monthly expenses .could at least occasionally cost as much as $5,000, but the trial court's award of $3,000 a month in child support represented the smallest figure noted by the wife. Thus, the record does not clearly demonstrate that the trial court improperly evaluated the wife’s resources or earning ability such that its judgment should be reversed on that basis.

5. The husband’s father had purchased with cash á separate house in which the husband had been living during the pendency of the divorce action. The husband testified that he was paying rent of $2,500 per month to his father.